1

2

3                    **UNITED STATES DISTRICT COURT**

4                        **DISTRICT OF OREGON**

5                        **PORTLAND DIVISION**

6

7  TAMI WIEDERHOLD,                    )
                                       )
8                    Plaintiff,        )     No. 03:11-CV-00998-HU
                                       )
9        v.                            )
   SEARS, ROEBUCK AND CO.,             )     **MEMORANDUM OPINION AND ORDER**
10 a New York corporation,             )            **ON MOTION FOR**
                                       )          **SUMMARY JUDGMENT**
11                   Defendant.        )

12            _____

13

14

15 Eric J. Fjelstad
   Smith & Fjelstad
16 722 N. Main
   Gresham, OR 97030
17
            Attorney for Plaintiff
18

19

20 Amy R. Alpern
   Janice H.J. Kim
21 Craig L. Leis
   Littler Mendelson, P.C.
22 121 S.W. Morrison, Suite 900
   Portland, OR 97204
23
            Attorneys for Defendant
24

25

26

27

28

1 - MEMORANDUM OPINION AND ORDER

1 HUBEL, Magistrate Judge:

2      The plaintiff Tami Wiederhold filed this employment action on

3 August 17, 2011, against her former employer, the defendant Sears,

4 Roebuck and Co. ("Sears").    Wiederhold claims that after she

5 developed a physical impairment, Sears refused to accommodate her

6 in violation of the Americans with Disabilities Act, 42 U.S.C.

7 § 12101 *et seq.* ("ADA"), and Oregon's corresponding Discrimination

8 Against Disabled Persons in Employment Act, ORS § 659A.001 *et. seq.*

9 (the "Oregon Act").   The case is before the court for consideration

10 of Sears's Motion for Summary Judgment, Dkt. #17.   The motion is

11 fully briefed, and the court heard oral argument on the motion on

12 August 21, 2012.

13

14                    ***BACKGROUND FACTS***

15 ***A.  Chronology of Wiederhold's employment with Sears***

16      The court observes that cobbling together a chronological

17 statement of the facts underlying this matter was complicated by

18 Wiederhold's failure to respond to Sears's factual allegations, or

19 to list conflicting factual allegations, in any cohesive manner.

20 Instead, Wiederhold claims Sears has included immaterial facts in

21 its recitation, without explaining which facts she deems immateri-

22 al, although she further states, "On the whole, . . . most of the

23 truly material facts can be found in [Sears's] fact statement."

24 Dkt. #23, ECF p. 7.  Thus, for purposes of determining the material

25 facts in the case, the court was left with Sears's factual summary,

26 the parties' exhibits, and what could be determined from Wieder-

27 hold's arguments opposing the summary judgment motion.    This

28 procedure was time-consuming and somewhat unwieldy, and illustrates

2 - MEMORANDUM OPINION AND ORDER

1  an ongoing issue the court faces in connection with its Local Rules
2  relating to summary judgment motions. At oral argument,
3  Wiederhold's attorney stated it was his intention that the court
4  assume, when he did not respond to a fact asserted by Sears in its
5  motion, that Wiederhold deemed that fact to be irrelevant. Why and
6  how the court would reach that conclusion is far from clear.

7     When the court revised its Local Rules in late 2010, one of
8  the topics that generated a great deal of discussion was whether
9  the court should eliminate the requirement for a separate concise
10 statement of facts in connection with summary judgment motions.
11 Prior to January 1, 2011, a party moving for summary judgment was
12 required to submit a "separately filed concise statement [to]
13 articulate the undisputed relevant material facts . . . essential
14 for the Court to decide only the motion for summary judgment - not
15 the entire case." LR 56-1 (Dec. 1, 2009). Local Rule 56-1 was
16 revised, effective January 1, 2011, to eliminate the requirement
17 for parties to submit a separate concise statement of material
18 facts, unless otherwise ordered by the court. The rule was revised
19 to provide as follows: "A party's factual positions must be
20 supported by citations, by page and line as appropriate, to the
21 particular parts of materials in the record. Unless otherwise
22 ordered by the court, a party is not required to file a separate
23 Concise Statement of Material Facts." LR 56-1(a) (Jan. 1, 2011).
24 Commentary was added to LR 56 to advise practitioners of the
25 change, and to note "that this change is subject to a period of
26 study and evaluation." Amendment History to LR 56, January 1,
27 2011. It was contemplated that Judges and attorneys would experi-
28 ment, to some degree, with different formats to arrive at the most

3 - MEMORANDUM OPINION AND ORDER

1 efficient method for the parties to advise the court of their
2 conflicting factual positions, and for the court to determine what
3 material facts are not genuinely disputed.  Unfortunately, the
4 results of any such experimentation in summary judgment practice
5 have failed to yield a single, cohesive, efficient procedure.

6      Under the current Local Rule, although a separate concise
7 statement of material facts is not required, a party still should
8 provide a sufficient discussion of the underlying facts, with
9 appropriate citations to the record, to support the party's factual
10 positions.  *See* LR 56-1(a); Fed. R. Civ. P. 56(c) (Procedures:
11 Supporting Factual Positions).  Particularly where, as here, a
12 party (in this case, the plaintiff Wiederhold) claims the opposing
13 party (in this case, Sears) is relying on immaterial facts, the
14 facts deemed immaterial should be identified, with some discussion
15 as to why the opposing party deems them immaterial.  *See* Fed. R.
16 Civ. P. 56(c)(1)(B) (assertion that a fact is genuinely disputed
17 must be supported by "showing that the materials cited do not
18 establish the absence or presence of a genuine dispute, or that an
19 averse party cannot produce admissible evidence to support the
20 fact").  In the present case, without such a discussion, the court
21 cannot identify clearly which factual assertions Wiederhold deems
22 relevant and material, and which she deems immaterial.  As a
23 result, the following factual summary is based, for the most part,
24 on Sears's brief, exhibits submitted by both parties, Sears's busi-
25 ness records, and records of Wiederhold's unemployment proceedings.
26 Except where noted, I find the following facts to be undisputed.

27      Wiederhold began working for Sears on October 14, 1987.  She
28 initially was hired as a cashier in the automotive department.

4 - MEMORANDUM OPINION AND ORDER

1  Over the ensuing years, she held a number of different positions at
2  the store.  In February 2009, she became a Merchandise and Customer
3  Assist Associate ("MCA").[1]    According to Wiederhold, the MCA
4  position was primarily a customer service job.  It required her to
5  keep the fitting rooms clean, put items left in fitting rooms back
6  on the racks, sometimes help the cashiers, make sure racks were
7  organized, keep racks stocked by bringing items out from the
8  stockroom, take care of returned items, keep items displayed on
9  tables nicely folded, and answer questions for customers.[2]    In
10 connection with keeping racks stocked and bringing items to the
11 floor from the stockroom, Wiederhold often had to climb ladders,
12 and lift more than ten pounds.[3]   She also had to move shelving
13 units that she characterized as "pretty heavy."[4]   She also moved
14 carts full of jeans and other items.  The carts were on wheels, but
15 they also were "pretty heavy."[5]

16     Wiederhold also was required to change prices on items,
17 marking them up or down as necessary.  This required her to be on
18 her feet, standing and walking around.  She also put signs up and
19 took them down, sometimes using a ladder for this task.[6]   She

20  _____

21     [1]Dkt. #19, ECF pp. 7-8 (citing Dkt. #22-1, Ex. 1 to Decl. of
   Craig Leis, excerpts from Wiederhold's deposition (hereafter "Pl.
22 Depo."), p. 58, ECF p. 11).

23     [2]Dkt. #22-1, Ex. 1, Pl Depo. pp. 81-85, 94, 95; ECF pp. 30-34,
24 41.

25     [3]*Id.,* pp. 89-91; ECF pp. 36-38.

26     [4]*Id.,* p. 91; ECF p. 38.

27     [5]*Id.,* pp. 92-93; ECF pp. 39-40.

28     [6]*Id.,* pp. 102-03, 107-08; ECF pp. 47-48, 52-53.

explained that prior to March 2009, the pricing job and the MCA job were done by separate teams.  In about March 2009, these tasks were combined into one job, and members of both teams then were responsible for all of these tasks.[7]  Wiederhold stated all aspects of the MCA job required a fast pace.  She considered the MCA job duties to be strenuous or physically demanding, and she indicated all of the job duties required walking.[8]  At her deposition, Wiederhold agreed the MCA job "for softline pricing" required her to be on her feet "90 to a hundred percent of the time."[9]

Around the same time Wiederhold became responsible for all of the various tasks involved in the combined MCA/pricing job, she also sought treatment for bone spurs she had had "for years" on both of her feet.[10]  In addition to the bone spurs, she was diagnosed with bursitis and tendinitis in both feet.[11]  In a "Report of Work Ability," dated March 9, 2009, Wiederhold's podiatrist listed a diagnosis of "Achilles tendonitis."[12]  He directed

---

[7]*Id.*, pp. 103-05, 113-14; ECF pp. 48-50, 57-58.

[8]*Id.*, p. 125; ECF p. 66.  One area of contention between the parties, discussed later in this opinion, is whether all of these duties were "essential functions" of the MCA position.

[9]*Id.*, p. 34; ECF p. 2.

[10]*Id.*, p. 63-64; ECF pp. 15-16.

[11]*Id.*, p. 64; ECF p. 16.

[12]Dkt. #22-1, Ex. 6 to Leis Decl., ECF p. 169.  Although the form does not so state, these restrictions refer to Wiederhold's left foot.  She has problems with both feet, but the ongoing restrictions discussed in this section, and which were the subject of her doctor's reports, relate to her left foot except where otherwise indicated.

6 - MEMORANDUM OPINION AND ORDER

Wiederhold to "wear a boot while at work"; "sit during her work shift as much as is possible"; and limit her time at work to "a total of 5 hrs per day."[13]   Wiederhold provided a copy of this doctor's note to Sears.  She was allowed to wear the boot to work for ten to twelve weeks, and her work schedule was reduced to five hours per day.[14]

On April 15, 2009, Wiederhold submitted an updated Report of Work Ability, restricting her to working "a maximum of 6 hrs a day."[15]  She submitted a doctor's note dated May 13, 2009, excusing her from work on May 12, 2009, "due to her painful foot after having physical therapy."[16]  A doctor's note dated May 29, 2009, excused Wiederhold from work on May 23, 2009, due to "Foot pain," indicating she was "[r]eleased for regular work duties on 5/24/09."[17]

Wiederhold submitted a doctor's certification dated May 26, 2009, for FMLA leave, indicating Wiederhold would be absent from

---

[13]*Id.*

[14]Pl. Depo. pp. 131-32, ECF pp. 68-69.  A second Report of Work Ability was completed by the same doctor, on the same day, with the same diagnosis.  However, this report indicates Wiederhold was restricted to working no more than "6 hrs a day."  Dkt. #22-1, Ex. 7 to Leis Decl., ECF p. 170.  Wiederhold testified both reports were submitted to Sears, but she did not recall the reason for the two somewhat-conflicting reports.  She did, however, indicate that whatever her work restriction was - whether five or six hours a day - Sears complied with the restriction.  Dkt. #24-1, Decl. of Eric J. Fjelstad, Ex. 1 (additional excerpts from Wiederhold's deposition), p. 135; ECF p. 11.

[15]Dkt. #22-1, Ex. 9 to Leis Decl., ECF p. 172.

[16]*Id.*, Ex. 8; ECF p. 171.

[17]*Id.*, Ex. 10; ECF p. 173.

7 - MEMORANDUM OPINION AND ORDER

work intermittently, two to three days per month, for a period of four months beginning May 1, 2009.  The form indicates her absences would be due to doctor's visits, physical therapy, and other treatments for "arthralgia of ankle/achilles tendonitis," and intermittent flare-ups of her condition would prevent her from being able to perform all of the functions of her job.[18]

On July 27, 2009, Wiederhold's doctor restricted her to working no more than "4-6 hour days per week," with no "more than 2 days in a row for 6 hours."[19]  Sears apparently was somewhat confused by the meaning of the restrictions noted on the form, and asked Wiederhold to obtain another doctor's note with clearer restrictions.[20]  She complied, and in a note dated August 10, 2009, her doctor indicated Wiederhold was limited to six hours a day for no more than two days in a row, and then she would require one day of rest before returning to work.[21]  Sears accommodated these work restrictions imposed by Wiederhold's doctor.[22]

Wiederhold saw her doctor on October 1, 2009, and was scheduled for surgery on her left foot on October 14, 2009.  A doctor's note indicated she would require ten weeks off work for recovery, remaining non-weight-bearing, and resting with her foot

---

[18]*Id.*, Ex. 11; ECF p. 174-77.

[19]*Id.*, Ex. 12; ECF p. 178.

[20]*Id.*, Ex. 1, Pl. Depo. p. 145; ECF p. 73.

[21]Dkt. #22-1, Ex. 13 to Leis Decl., ECF p. 179

[22]Dkt. #22-1, Ex. 1, Pl. Depo. pp. 170, 172; ECF pp. 86, 87.

elevated.[23]  The doctor estimated Wiederhold would be able to return to work on December 16, 2009,[24] and Wiederhold requested FMLA leave for a period of ten weeks from the date of her surgery.[25]  However, when Wiederhold was examined post-operatively on November 24, 2009, her doctor extended the date for her to return to regular work duties to January 4, 2010.[26]  On December 29, 2009, the doctor indicated Wiederhold would require another two months off work.  He did not list a date Wiederhold would be able to return to work, indicating she would "be re-evaluated at next visit."[27]  On February 26, 2010, the doctor indicated Wiederhold would be released for regular work duties on April 1, 2010.[28]  According to Sears, it accommodated Wiederhold's need for additional recovery time by extending her FMLA leave beyond her 12 weeks of protected leave.[29]

---

[23]Dkt. #22, Leis Decl., Ex. 14; ECF p. 180.

[24]*Id.*

[25]*Id.*, Ex. 15; ECF p. 181-83.

[26]*Id.*, Ex. 16; ECF p. 184.

[27]*Id.*, Ex. 17; ECF p. 185.

[28]*Id.*, Ex. 18; ECF p. 186.

[29]Dkt. #19, p. 11.  Sears cites pages 159-60 of Wiederhold's deposition in support of this statement.  However, the exchange between Sears's attorney and Wiederhold does not confirm that Sears extended Wiederhold's FMLA leave.  Sears's attorney asked Wiederhold if she was "aware that Sears gave [her] additional FMLA weeks," not limiting her "FMLA to the 12 weeks required under law."  Wiederhold responded that she was not aware of that fact.  Dkt. #22-1, Ex. 1, Pl. Depo. pp. 159-60; ECF pp. 77-78.  Nevertheless, Wiederhold does not dispute this fact in her response to Sears's motion for summary judgment.  *See* Dkt. ## 23 & 24.

9 - MEMORANDUM OPINION AND ORDER

1    On Friday, March 26, 2010, Nagaraj Ramaswamy, from "Inquiry

2  Services" at Sears Holding Corporation, sent an e-mail to Ann Marie

3  Betancourt-Reyes ("Betancourt"), Sear's Human Resources Lead,

4  discussing Wiederhold's short-term disability status. Ramaswamy

5  had confirmed with Wiederhold's insurance company that she had been

6  approved for short-term disability from October 14, 2009, through

7  March 8, 2010.[30]

8    On Saturday, March 27, 2010, Betancourt contacted Wiederhold

9  to discuss her upcoming April 1, 2010, return to work. According

10 to Betancourt, she suggested several possible temporary accommoda-

11 tions for Wiederhold, "including shorter hours, possible job

12 modifications, and temporary placement into [an] alternative job

13 until fully recovered[.]"[31]  Betancourt memorialized her conversa-

14 tion with Wiederhold in an e-mail to Ramaswamy.  Among other

15 things, she noted the following:

16           On 3/27/10 I contacted Ms. Wiederhold and
          informed her that I have her scheduled to
17           [return to work] on 4/1/10 and will need a
          Doctor's [note] to release.  Ms. Wiederhold
18           insisted that she is not ready to come back to
          work and feels that any accommodations that I
19           suggested is [sic] not beneficial for her
          (i.e., shorter hours, possible work accom-
20           modations, alternative job placement until
          full job capability) and any accommodations
21           may be strenuous on other co-workers.  She
          would speak with her physician and review any

22

23

24    [30]Dkt. #20, Declaration of Ann Marie Betancourt-Reyes
   ("Betancourt Decl."), ¶ 14; Dkt. #21-1, Ex. C, ECF pp. 4-5.  In
25 addition, according to Ramaswamy's calculations, Wiederhold had
   been overpaid during that time period for 227 hours, which would
26 "have to be retrieved in the future pay checks." Betancourt Decl.
   ¶ 2. Neither party has asserted any claim in this matter related to
27 any overpayment of wages.

28    [31]Id., ¶ 2.

10 - MEMORANDUM OPINION AND ORDER

accommodations. . . .   I reminded her that according to last physicians note she is scheduled to return to work on 4/1/10.

.   .   .

Further, in speaking with Ms. Wiederhold, she stated, she would like to possibly look into a transfer or job placement where she will not be on her feet and iterated that she may need surgery on the other foot due [to] foreseen signs and symptoms that the MCA/Softlines positions entitles [sic].   She insists that MCA Softlines is a too demanding position for a person with foot problems.[32]

Wiederhold apparently returned to work as scheduled, but then on April 22, 2010, her doctor placed her left foot in a cast, and directed Wiederhold to be off work for six weeks, noting her return-to-work date would be determined "on 6/3/2010."[33]  She saw her doctor on June 21, 2010, and he released her to return to work on June 28, 2010, "with the following restrictions: [she] can only work 25 hours total a week and also can only work 5 hours a day for the next 2 months."[34]  On July 6, 2010, her doctor signed a report after the fact, indicating Wiederhold was authorized to return "to regular work duties on July 4, 2010."[35]  According to Sears, it again extended Wiederhold's FMLA leave to accommodate these requests for additional leave time.[36]

Wiederhold worked at the MCA job from July 4, 2010, to September 1, 2010, consistent with restrictions imposed by her

---

[32]Dkt. #20-1, Ex. C, ECF p. 4.

[33]Dkt. #22-1, Ex. 19, ECF p. 187.

[34]*Id.*, Ex. 20, ECF p. 188.

[35]*Id.*, Ex. 21, ECF p. 189.

[36]Dkt. #19, ECF p. 18; *see* note 28, *supra*.

11 - MEMORANDUM OPINION AND ORDER

doctor.[37]  Wiederhold saw her doctor again on September 1, 2010. At that time, he imposed additional work-related restrictions, stating, "Pt needs to be off of her feet while working.  Pt needs a job at work where she can be off of her feet."[38]  To accommodate the new restriction, Wiederhold was assigned to work on a backlog of "PCNs" - which involved re-pricing merchandise to reflect a markdown or markup.[39]  Wiederhold did the PCNs "for two plus months."[40]  When Wiederhold completed the backlog of PCNs, in early November 2010, she was placed back on the regular schedule as an MCA.[41]

In the meantime, on October 25, 2010, Betancourt provided Wiederhold with a Health Care Provider Certification form for her doctor to complete in order for Wiederhold to request formal accommodation for her ongoing work restrictions.[42]  Wiederhold's doctor completed the certification form on November 11, 2010, indicating Wiederhold's condition was expected to be "permanent," and due to foot pain, she would be unable to perform job functions involving "[s]tanding, walking, climbing, pushing [and] pulling."[43]

---

[37]Dkt. #22-1, Ex. 1, Pl. Depo. pp. 169-70; ECF pp. 85-86.

[38]Dkt. #22-1, Ex. 23; ECF p. 194.

[39]Dkt. #19, ECF pp. 12, 18-19; Dkt. #22-1, Pl. Depo. p. 172, ECF p. 87.

[40]Dkt. #22-1, Pl. Depo. p. 172, ECF p. 87.

[41]*Id.*, Pl. Depo. p. 173, ECF p. 88.

[42]*Id.*, Pl. Depo. pp. 174-76, ECF pp. 89-91; Dkt. #22-1, Exs. 24 & 25, ECF pp. 195-97.

[43]Dkt. #22-1, Ex. 25, p. 1; ECF p. 196.

1 The doctor recommended Wiederhold's limitations be accommodated by
2 "Job Restructuring" in the areas of "Duties, Responsibilities,
3 [and] Sitting."[44]  Wiederhold testified it was her expectation that
4 Sears would either allow her to continue performing those aspects
5 of the MCA job that she was able to perform within the doctor's
6 limitations, or provide some other type of accommodation.  She
7 stated she was not aware she had the right to request, for example,
8 a motorized scooter, "or even another job elsewhere."[45]  However,
9 Wiederhold further stated that if she limited herself to the
10 limitations recommended by her doctor, then even with a scooter,
11 she would be unable to perform some of the essential functions of
12 the MCA position.  Specifically, she stated she would be unable to
13 perform tasks involving climbing, such as to retrieve items on high
14 shelves or to hang signs on the walls.[46]

15    When Wiederhold noticed she had been put back on the regular
16 schedule at the first of November 2010, she talked with the store
17 manager Jay Kyser, who, according to Wiederhold, "seemed genuinely
18 surprised, like he didn't understand why [she] was back on the
19 schedule[.]"[47]  Wiederhold also contacted the Sears corporate HR
20 department[48] to ask whether she should ignore her doctor's orders

21

22    [44]*Id.*, Ex. 25, p. 2; ECF p. 197; Pl. Depo. p. 177, ECF p. 92.

23    [45]Pl. Depo. p. 178, ECF p. 93.

24    [46]*Id.*, pp. 179-80, ECF pp. 94-95.

25    [47]Dkt. #22-1, Ex. 4, Transcript of unemployment hearing
26 ("Unemp. Tr."), at 10; ECF p. 156.

27    [48]Sears refers to its corporate HR department's "telephone
hotline that employees can call anytime for issues related to their
28                                              (continued...)

13 - MEMORANDUM OPINION AND ORDER

and work as scheduled, or how she should proceed.  She was told to "continue to call out" (i.e., call in sick), and wait for a response to her request for accommodation.[49]   According to Wiederhold, she was unable to perform the MCA job because of its fast pace, which required her to "run[] around the floor at 100 miles an hour trying to help customers, and keep the floor cleaned and stocked[.]"[50] She stated the pain and stress were "just unbear-able," rendering her short-tempered and tearful, and affecting her ability to sleep and enjoy life.[51]

Despite having talked with Kyser, and the corporate HR repre-sentative, Wiederhold was still listed on the regular MCA schedule for the third week in November.  She decided to talk with her immediate manager, Christine Cole Vyse.  Cole Vyse clarified Wiederhold's restrictions with her, and then she and Wiederhold "started brain storming" about jobs Wiederhold could do.[52]  Cole Vyse asked Kyser to attend the meeting so everyone would be clear about what was decided.  According to Wiederhold, the corporate HR representative and Kyser both explained the reason she was put back on the regular schedule was that while she was working on the PCN backlog, she was paid from a training budget, and those funds were

---

[48](...continued)
employment" as "88Sears." Dkt. #19, ECF p. 21.

[49]Dkt. #22, Ex. 4, Unemp. Tr. at 10-11, 13; ECF pp. 156-57, 159.

[50]*Id.* at 12, ECF p. 158.

[51]*Id.*

[52]*Id.*, p. 14; ECF p. 160.

14 - MEMORANDUM OPINION AND ORDER

1  no longer available.  As a result, they had to "figure out where
2  the hours were going to come from."[53]

3      Wiederhold, Cole Vyse, and Kyser decided Wiederhold would try
4  to do a job "called fill from floor," involving restocking the
5  sales floor.  Wiederhold agreed to try the job, and she was
6  assigned to those duties for the fourth week of November 2010.[54]
7  Cole Vyse told Wiederhold to let her know if she had problems
8  performing the duties of this job.[55]  Although the job did not
9  require her to be on her feet as much as the MCA job, the duties of
10 the "fill from floor" job still required Wiederhold to be on her
11 feet, walking around, for about 75% of the day.  She found the job
12 difficult, and by the end of the day, she would have problems
13 walking, and a lot of pain and swelling in her feet.  Her call-ins
14 increased as a result.  According to Wiederhold, she tried to
15 explain to Cole Vyse why the job was difficult, but Cole Vyse
16 continued to schedule her in that job each day.[56]

17     On or about December 6, 2010, Sears corporate HR determined
18 that Wiederhold was unable to perform the essential functions of
19 the MCA job.  A corporate representative advised Betancourt that
20 Sears would be unable to accommodate Wiederhold's job restrictions.
21 Betancourt was directed to communicate this decision to

22

23

24     [53]*Id.*, pp. 13-14; ECF pp. 159-60; *see* Dkt. #22-1, Pl. Depo, p.
   45; ECF p. 7; *id.*, Ex. 2, Depo. of Christine Cole Vyse, pp. 80-81,
25   ECF pp. 142-43.

26     [54]Dkt. #22-1, Ex. 4, Unemp. Tr. p. 14; ECF p. 160.

27     [55]*Id.*

28     [56]*Id.*, pp. 15-16; ECF pp. 161-62.

Wiederhold.[57]  Wiederhold described the events of December 2010, at

a hearing on her application for unemployment benefits, in March

2011:

> We're at the beginning of December.  And
> pretty much for the . . . until the 19th I did
> the fill from floor [job], and called in when
> I needed to, and the doctor told me to stay
> off my foot, and [I] just struggled to do the
> best that I could do at the job that I was
> given. I did not go and talk to anybody again
> because I knew that we were at the end of the
> line and I was also afraid for my job . . .
> [b]ecause I felt that they had already done
> everything they were going to do, and that
> there was really no other steps that could be
> taken and that they were going to . . . just
> be tired of the situation.  The complaining,
> and the . . . you know, just want to be done
> with it.
>
> .    .    .
>
> [As a result of the request for accommoda-
> tion,] I was told, I think it was a couple of
> days before the 19th, that the decision had
> been made and [Kyser] wanted to talk to me, he
> told me to call him when I had some free
> time. . . .  And so he had told me when I came
> in on the 19th that he wanted to talk to me
> that day before I went home and that they
> would call me when they were ready.    I
> finished my shift and nobody had called me, so
> I went up to the office and I [let] them know
> I was there, and then I waited.    It was
> probably a half hour, 40 minutes, and then
> [Betancourt, Kyser,] and I went into his
> office for our meeting about the result of the
> accommodation. . . .   [Kyser] told me that
> because most jobs within Sears do not fall
> within the restrictions of my disability, that
> they would not be accommodating me.
>
> . . . .
>
> They talked about the fact that they had
> called around to several places that were
> still part of Sears, but outside my Sears
> store, for like, you know, maybe delivery, or

---

[57]Dkt. #20, Betancourt Decl., Ex. F, p. 7; ECF p. 17.

16 - MEMORANDUM OPINION AND ORDER

outlet stores, or . . . I can't think of all
the different places that they had been
calling around, trying to see if anything else
was available, and because of the time of year
it was, they hadn't had any luck.  [Kyser]
talked about calling the person who made the
decision again, and talking to them, because I
had asked how they were working for me to
provide reasonable accommodations in this
situation, and he couldn't answer that so he
was going to call and talk to somebody about,
you know, if there is anything else I could do
or if this was the end of the line.  And
[Betancourt] was going to call a couple more
places and see if anything else had opened.
And then they also talked to me about a few
jobs in Sears that were available, they would
require me to go down to part-time and lose my
benefits, and there still wouldn't be accommo-
dations, but they wanted me to consider them.
One was like a seasonal loss prevention job,
and another one was commission on the sales
floor, and the third one was an automotive
mechanic kind of job, which I'm not even
qualified for, so they told [Betancourt] to
stop bringing that one up because it wasn't
possible. . . .  I was told that they would
give me 10 days to decide what I wanted to do,
and that was . . . basically the end of the
meeting.**58**

    After the meeting, Wiederhold believed her only option, if she
wanted to continue working full-time for Sears, was to return to
the MCA job "in its entirety," with "absolutely no accommodation."**59**
She was placed on the schedule for the MCA job, but she called in
each week to advise that she "would not be coming in until the
situation was resolved," because she was not able to do the MCA
job.**60**

/ / /

---

    **58***Id.*, pp. 16-17; ECF pp. 162-63.

    **59***Id.*, p. 18; ECF p. 164.

    **60***Id.*, p. 19; ECF p. 165.

17 - MEMORANDUM OPINION AND ORDER

On December 22, 2010, Wiederhold completed an Intake Question-
naire to open a discrimination complaint with the Equal Employment
Opportunity Commission (EEOC).[61]  She indicated the basis for her
complaint was that Sears "refused reasonable accommodation" for her
disability.[62]  Wiederhold indicated her local store manager, Kyser,
and her local HR lead, Betancourt, had "done everything to
accommodate" her, and it was a "Hoffman Estates ACH Specialist"
that had made the decision on behalf of Sears that her disability
could not be accommodated.[63]  Wiederhold described tasks she had
been doing for several months, noting those tasks all were part of
the MCA job, just not the "whole job."  She expressed confusion as
to why she could not continue in the same capacity, because those
tasks still had to be done by someone.[64]  She also claimed that
after her foot problems began, Cole-Vyse intentionally scheduled
her for tasks that were the hardest on her feet "on purpose . . .
as if she was trying to force [Wiederhold] to quit by causing [her]
mysery [sic]."[65]  Wiederhold stated she had to decide by
December 29, 2010, whether she would return to the full MCA job
duties, against her doctor's orders, or move to a part-time
position and lose her benefits.[66]  She stated Sears had "back[ed]

---

[61]Dkt. #22-1, Ex. 27; ECF pp. 202-07.

[62]*Id.*, p. 2; ECF p. 203.

[63]*Id.*

[64]*Id.*, pp. 2-4; ECF pp. 203-05.

[65]*Id.*, p. 3; ECF p. 204.

[66]*Id.*, p. 5; ECF p. 206.

18 - MEMORANDUM OPINION AND ORDER

[her] into a corner and [made her] lose the income and medical [her] family needs to survive."[67]  Wiederhold checked a box on the form indicating she wanted to file a discrimination charge, and she authorized the EEOC to look into her allegations.[68]

Wiederhold's financial situation was suffering due to her lack of income.  She spoke with an attorney about her situation, and on December 27, 2010, at her attorney's urging, she called the Sears corporate office and her local store to see if they might provide her with a motorized scooter.  According to Wiederhold, she never got a response to this request.[69]  Wiederhold believed there were several jobs at Sears she would have been able to do with some accommodation, including jobs she had discussed in her meetings with management.  These included doing mark-downs and markups; making signs; doing some of the MCA functions she could do from a chair; and doing "the sales from floor[.]"[70]  She agreed, however, that even with a scooter, there were some essential functions of the MCA job she would have been unable to perform; specifically, those tasks involving climbing.[71]  After the meeting on December 19, 2010, Wiederhold did not believe Sears would offer her any modification of job duties or other accommodation.[72]  She was

---

[67]*Id.*, p. 5; ECF p. 205.

[68]*Id.*, p. 6; ECF p. 207.

[69]*Id.*, p. 18; ECF p. 164.

[70]*Id.*, p. 19; ECF p. 165.

[71]Dkt. #22-1, Pl. Depo. pp. 179-81; ECF pp. 94-96.

[72]*Id.*

19 - MEMORANDUM OPINION AND ORDER

scheduled to work on January 8, 2011, but instead, Wiederhold tendered her resignation that morning. According to her, Sears did not offer her any other position with the store, or any accommodations that would allow her to continue working; they simply accepted her resignation.[73]

In its brief, Sears describes efforts it continued to take following the December 19, 2010, meeting, to try to find a position that would accommodate Wiederhold's restrictions.[74] Sears made a determination that even using a scooter, Wiederhold would be unable to perform the essential functions of the MCA position. Therefore, Sears began looking at other job possibilities for Wiederhold. On January 4, 2011, Wiederhold called Betancourt to ask for an update regarding her request for accommodation. At Betancourt's request, Wiederhold reiterated the restrictions imposed by her doctor. Betancourt and Wiederhold discussed possible alternative positions, including the possibility of part-time work, or a cashier job. Wiederhold indicated she would be interested in a cashier job, and Betancourt said she would communicate that fact to the HR department.[75] Betancourt sent an e-mail to Kyser the same day, indicating Wiederhold would be interested in a cashier position, but would need the ability to use a stool on a permanent basis.[76] According to Betancourt, when Wiederhold came to work on January 8, 2011, Betancourt had planned to talk with her about the possibility of

---

[73]*Id.*, p. 20; ECF p. 166.

[74]*See* Dkt. #19, ECF pp. 25-30.

[75]Dkt. #20-1, Betancourt Decl., Ex. H, pp. 3-4; ECF pp. 22-23.

[76]*Id.*, Ex. I; ECF p. 25.

20 - MEMORANDUM OPINION AND ORDER

working in a cashier position, and give her accommodation paperwork for completion.   However, Wiederhold never returned to work, instead resigning on January 8, 2011.[77]   According to Betancourt, a full-time cashier position became available on January 10, 2011, that Wiederhold likely could have filled, using a stool as needed.[78]

In a supplemental declaration, Wiederhold's attorney submitted information about another piece of equipment - a "man lift" - that Wiederhold argues could have allowed her to perform functions of the MCA job that otherwise would require climbing.[79]   Sears filed a motion to strike the supplemental declaration as untimely and prejudicial[80], but at oral argument, Sears withdrew the motion, and therefore it need not be decided.

## B.   Duties of the MCA position

As part of its business records, Sears maintains a description of the MCA position that summarizes the position, lists key roles and responsibilities involved, and lists the physical demands of the job.[81]   The position is described as follows:

> The Merchandise and Customer Assist Associate is responsible for the departmental merchandising and also assisting customers.   The associate will spend his/her time replenishing the floor, maintaining standards, and

---

[77]Dkt. #20, p. 3, ¶ 8.

[78]*Id.*, ¶ 11.

[79]Dkt. #46.

[80]Dkt. ##47-49.

[81]Dkt. #20-1, Betancourt Decl., Ex. A.

21 - MEMORANDUM OPINION AND ORDER

assisting customers.  The associate will be responsible for floor recovery.[82]

"Key Roles and Responsibilities" listed for the MCA position include the following:

- Maintain the sales floor and ensure merchandise presentation standards are met.
- Replenish the floor.
- Assist customers upon request.
- Assist cashiers on customer issues.
- Hand[le] and resolve customer issues.
- Follow all applicable laws, regulations, and company policies.
- Performs miscellaneous duties, as assigned.[83]

Under "Physical Demands of Job," the MCA position description indicates the associate will be required to lift up to twenty pounds occasionally (defined as 1-33% of the time), and ten pounds frequently (defined as 34-66% of the time); kneel, crawl, stand, sit, and type/keyboard occasionally; climb ladders, reach above the shoulders, and do handling/fingering frequently; and bend, squat, twist, turn/pivot, reach outward, and walk constantly (defined as 67-100% of the time).[84]

When Wiederhold reviewed the MCA job description during her deposition, she agreed the duties listed on the form were essential duties of the job, but she also indicated the list was incomplete. Specifically, she noted the form does not list the duties of the pricing job that was combined with the MCA job in March 2009.[85]

/ / /

---

[82] Id.

[83] Id.

[84] Id.

[85] Dkt. #22-1, Pl. Depo. pp. 123-24; ECF pp. 64-65.

22 - MEMORANDUM OPINION AND ORDER

1                    **SUMMARY JUDGMENT STANDARDS**

2       Summary judgment should be granted "if the movant shows that

3  there is no genuine dispute as to any material fact and the movant

4  is entitled to judgment as a matter of law."   Fed. R. Civ. P.

5  56(c)(2).   In considering a motion for summary judgment, the court

6  "must not weigh the evidence or determine the truth of the matter

7  but only determine whether there is a genuine issue for trial."

8  *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002)

9  (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th

10 Cir. 1996)).

11      The Ninth Circuit Court of Appeals has described "the shifting

12 burden of proof governing motions for summary judgment" as follows:

13           The moving party initially bears the burden of
             proving the absence of a genuine issue of
14           material fact.  *Celotex Corp. v. Catrett*, 477
             U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d
15           265 (1986).  Where the non-moving party bears
             the burden of proof at trial, the moving party
16           need only prove that there is an absence of
             evidence to support the non-moving party's
17           case.  *Id.* at 325, 106 S. Ct. 2548.  Where the
             moving party meets that burden, the burden
18           then shifts to the non-moving party to desig-
             nate specific facts demonstrating the exis-
19           tence of genuine issues for trial.  *Id.* at
             324, 106 S. Ct. 2548.  This burden is not a
20           light one.  The non-moving party must show
             more than the mere existence of a scintilla of
21           evidence.  *Anderson v. Liberty Lobby, Inc.*,
             477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed.
22           2d 202 (1986).  The non-moving party must do
             more than show there is some "metaphysical
23           doubt" as to the material facts at issue.
             *Matsushita Elec. Indus. Co., Ltd. v. Zenith
24           Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct.
             1348, 89 L. Ed. 2d 528 (1986).  In fact, the
25           non-moving party must come forth with evidence
             from which a jury could reasonably render a
26           verdict in the non-moving party's favor.
             *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In
27           determining whether a jury could reasonably
             render a verdict in the non-moving party's
28           favor, all justifiable inferences are to be

1    drawn in its favor.  *Id.* at 255, 106 S. Ct.
2    2505.

3  *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th
4  Cir. 2010).  Notably, "[a]s a general matter, the plaintiff in an
5  employment discrimination action need produce very little evidence
6  in order to overcome an employer's motion for summary judgment."
7  *Chuang v. Univ. of Calif. Davis, Bd. of Trustees*, 225 F.3d 1115,
8  1124 (9th Cir. 2000).  The *Chuang* court explained that this minimal
9  evidence standard is due to the nature of employment cases, where
10 "'the ultimate question is one that can only be resolved through a
11 searching inquiry – one that is most appropriately conducted by a
12 factfinder, upon a full record.'"   *Id.* (quoting *Schnidrig v.*
13 *Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)).

14

15                 ***STANDARDS RELATED TO WIEDERHOLD'S CLAIMS***

16     Wiederhold brings claims under the ADA and the corresponding
17 Oregon Act, alleging Sears discriminated against her because of her
18 disability.[86]  *See* Dkt. #1.  Specifically, she claims Sears (1)
19 constructively discharged her due to her disability; (2) retaliated
20 against her because she sought accommodation for her disability;
21 (3) failed and/or refused to engage in the interactive process to
22 determine if a reasonable accommodation existed that would allow
23 her to perform the essential functions of the MCA job; and (4)
24 failed to accommodate her disability so she could continue working.

25

26     [86]For purposes of its Motion for Summary Judgment, Sears
   assumes Wiederhold's foot problems constitute a disability under
27 the ADA and Oregon law.  Dkt. #19, ECF p. 30, note 16.  For
   purposes of Sears's motion, the court will make the same assump-
28 tion.

24 - MEMORANDUM OPINION AND ORDER

1 *Id.*  She seeks economic and non-economic damages for these alleged
2 violations of the ADA and the Oregon Act.   She further claims
3 Sears's actions "were part of a pattern and practice of discrimina-
4 tion against disabled employees," and she seeks an injunction to
5 prevent Sears from continuing the alleged discriminatory practices.
6 *Id.*

7     In general, the ADA prohibits an employer like Sears[87] from
8 discriminating "against a qualified individual on the basis of
9 disability in regard to job application procedures, the hiring,
10 advancement, or discharge of employees, employee compensation, job
11 training, and other terms, conditions, and privileges of employ-
12 ment."  42 U.S.C. § 12112(a).  The ADA defines several terms that
13 are critical to interpreting the Act.  A "qualified individual" is
14 defined as:

> [A]n individual who, with or without reason-
> able accommodation, can perform the essential
> functions of the employment position that such
> individual holds or desires.  For purposes of
> this subchapter, consideration shall be given
> to the employer's judgment as to what func-
> tions of a job are essential, and if an
> employer has prepared a written description
> before advertising or interviewing applicants
> for the job, this description shall be con-
> sidered evidence of the essential functions of
> the job.

22 42 U.S.C. § 12111(8).

23     The ADA gives examples of what is included within the term
24 "discriminate against a qualified individual on the basis of disa-
25 bility":

---

27     [87]Neither party disagrees that Sears meets the criteria of an
"employer" or "covered entity" for purposes of the ADA.  *See* 42
28 U.S.C. § 12111(2) & (5).

25 - MEMORANDUM OPINION AND ORDER

    (A)   not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business. . .; or

    (B)   denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such [employer] to make reasonable accommodation to the physical or mental impairments of the employee or applicant[.]

42 U.S.C. § 12112(b)(5)[88].

As for what constitutes "reasonable accommodation," the ADA provides as follows:

    The term "reasonable accommodation" may include –

        (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

        (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

The corresponding Oregon law provides, "It is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in

---

[88]Sears does not argue that providing reasonable accommodation to Wiederhold would result in an "undue hardship," as defined in 42 U.S.C. § 12111(10).

26 - MEMORANDUM OPINION AND ORDER

1  compensation or in terms, conditions or privileges of employment on
2  the basis of disability." ORS § 659A.112. The Oregon Act is
3  "construed to the extent possible in a manner that is consistent
4  with any similar provisions of the [ADA]." ORS § 659A.139(1).
5  Thus, Wiederhold's claims under the ADA and the Oregon Act are
6  analyzed the same. *See, e.g.*, *Haddock v. Lucent Technologies,*
7  *Inc.*, 2008 WL 4133573 at *5 (D. Or. Aug. 29, 2008) (Brown, J.)
8  (same analysis applies to claims under ADA and Oregon law) (citing
9  *Washburn v. Columbia Forest Prod., Inc.*, 240 Or. 469, 176-77, 134
10 P.3d 161, 164-65 (2006)).

## DISCUSSION

13  Sears claims Wiederhold's disability discrimination claims all
14 fail, for two reasons: (1) Wiederhold was not a "qualified indi-
15 vidual with a disability" because she could not perform the
16 essential functions of her job, with or without accommodation; and
17 (2) Sears did, in fact, engage in the interactive process with
18 Wiederhold for nearly two years, but was unable to continue the
19 interactive process due to Wiederhold's voluntary resignation.[89]
20 In addition, Sears argues Wiederhold cannot prove her disparate
21 treatment claim[90] because (a) there is no evidence Sears created,

---

23  [89]Dkt. #19, ECF pp. 30-31.

24  [90]Although Wiederhold characterized Count 1 of her First Claim
25 for Relief as a "disparate treatment" claim, it appears this is a
    misnomer. She actually is alleging a disability discrimination
26 claim, where the adverse employment action she suffered was a
    constructive discharge brought about, alternatively, by Sears's
27 failure to engage in the interactive process as required by the
    ADA, or failure to accommodate her disability as required by the
28                                                    (continued...)

27 - MEMORANDUM OPINION AND ORDER

or exposed Wiederhold to, intolerable conditions that forced her to resign; and (b) Wiederhold actually suffered no adverse employment action, instead resigning voluntarily.[91]    Further, Sears argues Wiederhold failed to exhaust her administrative remedies with regard to her constructive discharge claim, requiring dismissal of that claim.

## A.    "Qualified Individual"

Sears argues Wiederhold was not a "qualified individual with a disability," for purposes of the ADA and the Oregon Act, because she was unable to perform the essential functions of the MCA job, either with or without an accommodation.  Stated differently, Sears claims Wiederhold cannot show she would have been able to perform the essential functions of the MCA job even with the accommodations Wiederhold suggests; i.e., the use of a scooter and a reaching device.[92]  Sears relies on its written job description of the MCA position to establish the "essential functions" of the position. In Sears's view, the "key roles and responsibilities" enumerated in the MCA job description encompassed the pricing-related duties described by Wiederhold in her deposition.[93]  Sears asserts that

---

[90] (...continued)
ADA.  At oral argument, Wiederhold's attorney conceded that there is no evidence Wiederhold was treated differently than other similarly-situated employees; i.e., no evidence of "disparate treatment."

[91] Dkt. #19, ECF pp. 46-50.

[92] *Id.*, ECF p. 35.

[93] *Id.*, note 19.

28 - MEMORANDUM OPINION AND ORDER

1  given the restrictions imposed by Wiederhold's doctor, she would be
2  unable to perform activities requiring climbing and pushing/
3  pulling. Thus, although a scooter would assist her with mobility,
4  Wiederhold would not be able to perform any of the duties requiring
5  her to climb a ladder, or to push/pull heavy carts full of
6  merchandise.[94]

7      Wiederhold argues Sears is conflating the physical demands of
8  the MCA position and its essential functions. She argues the
9  essential functions of the MCA position, and the means of accom-
10  plishing those tasks, are two different things; in other words,
11  what is important is that the tasks get done, not the means by
12  which they are accomplished. Wiederhold argues she could have
13  performed the essential functions of the MCA position with reason-
14  able accommodations, including the use of a reaching device and a
15  motorized scooter.

16      In her brief, Wiederhold argues that "very little of [her]
17  time performing MCA duties actually required her to be on her
18  feet."[95] In support of her argument, Wiederhold cites paragraph 3
19  of her Declaration submitted in support of her response to Sears's
20  Motion for Summary Judgment.[96] Sears moves to strike paragraph 3
21  of Wiederhold's Declaration, arguing, among other things, that her
22  statements contradict and/or substantively alter her deposition

23

24

---

25      [94]*Id.*, ECF pp. 33-37.

26      [95]Dkt. #23, ECF p. 12 (citing Dkt. #24-2, Wiederhold's
27  Declaration, ¶ 3).

28      [96]*Id.*

29 - MEMORANDUM OPINION AND ORDER

testimony.[97]   Sears cites numerous instances during Wiederhold's deposition when she testified the MCA job duties frequently required her to climb a ladder; climbing ladders was "very, very difficult" for her, and "one of the hardest things for [her] to do"; and climbing a ladder three times during an eight-hour shift "would hurt."[98]   Wiederhold also testified she has to sit to put on pants, because she "can't stand all [her] weight on one foot."[99] As noted above, Wiederhold also agreed that Sear's written job description for the MCA job, which lists climbing as a "frequent" duty of the MCA job, "looks about right."[100]

Wiederhold argues her statements in her Declaration do not contradict her earlier statements.   She notes that during her deposition, she was never asked if she would have been able to handle occasional climbing duties if she had been accommodated with a scooter or similar device for the performance of the other duties of the MCA position.   She also contends that during the last few months of her employment with Sears, she typically did not have to do much climbing, and therefore, she would have been able to

---

[97]Dkt. #29; Dkt. #30, pp. 1-7.

[98]*Id.* (citing Wiederhold Depo. pp. 71, 87, 89, 91, 108; and Wiederhold's handwritten statement to the Oregon Bureau of Labor and Industries ("BOLI"), Dkt. #34-1, Ex. 37; ECF pp. 27-28).

[99]Dkt. #22-1, Wiederhold Depo. p. 67; ECF p. 19.

[100]*Id.*, Wiederhold Depo. p. 124; ECF p. 65; *see* Dkt. #20-1, Betancourt Decl., Ex. A, MCA job description.

30 - MEMORANDUM OPINION AND ORDER

1  continue working in that same capacity had she been provided with
2  a scooter.[101]

3      I recently observed that a party is not permitted to contra-
4  dict prior deposition testimony for purposes of creating an issue
5  of fact. *Nolan v. Transcend Servs., Inc.*, slip op., 2012 WL 14021
6  at *5 (D. Or. Jan. 4, 2012) (Hubel, M.J.). The Ninth Circuit Court
7  of Appeals has observed, "If a party who has been examined at
8  length on deposition could raise an issue of fact simply by
9  submitting an affidavit contradicting [her] own prior testimony,
10 this would greatly diminish the utility of summary judgment as a
11 procedure for screening out sham issues of fact." *Kennedy v.*
12 *Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (internal
13 quotation marks, citations omitted); *accord Nolan, supra*. However,
14 the *Kennedy* court further noted this rule only applies to actual
15 "sham" testimony, rather than to the case where a subsequent
16 affidavit merely explains or clarifies certain aspects of the
17 deposition testimony. *Kennedy*, 952 F.2d at 266-67.

18     In this case, Wiederhold's explanation of her subsequent
19 Declaration barely escapes the prohibition on contradicting one's
20 own deposition testimony. Her declaration is perilously close to
21 a clear contradiction of parts of her deposition testimony.
22 However, the context of the questioning in the deposition, and the
23 statements in the declaration, if repeated at trial, will need to
24 be evaluated by the finder of fact to determine if she is "changing
25 her story." I find she has, by a slim margin, succeeded in

26

27     [101]Dkt. #35, pp. 3-4. *See also* Dkt. #46, suggesting Wiederhold
   could have performed duties involving climbing if she were accom-
28 modated with an "electric man lift," or similar device.

31 - MEMORANDUM OPINION AND ORDER

establishing a factual issue for the jury's consideration regarding whether she could have performed the essential functions of the MCA job if she had been provided with a scooter, a reaching device, a "man lift," or some other accommodation, and thus, she has avoided summary judgment.

Perhaps more importantly, Wiederhold also would be covered by the ADA if she could perform the essential functions of another position in the company which she "desired," with or without reasonable accommodation, even if she were unable to perform the essential functions of the MCA position. *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111 (9th Cir. 2000) (noting this conclusion "is supported by nearly every circuit which has considered the issue"), *rev'd on other grounds*, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002).  It appears from the statements of Sears's own witnesses that Wiederhold could have performed the cashier position, with the reasonable accommodation of using a stool as necessary.  If so, then Wiederhold would be a "qualified individual" on that basis.

I therefore **deny** Sear's motion (Dkt. #29) to strike paragraph 3 of Wiederhold's Declaration.  For the same reason, I **deny** Sear's Motion for Summary Judgment on this basis.

**B.    *Interactive Process***

Sears argues it did, in fact, engage in the interactive process with Wiederhold in an attempt to determine whether reasonable accommodations would enable her to continue working. Sears argues it complied with every accommodation Wiederhold requested up until December 2010, when it determined she could not

perform the essential functions of the MCA job, even with a motorized scooter.  Sears notes it modified Wiederhold's work schedule, permitted her to wear a boot and cast, gave her rest breaks as required, extended her FMLA leave beyond what was required by law, and even "temporarily eliminated essential job functions."[102]  Sears argues it was Wiederhold's premature resignation that halted the interactive process, rather than any action taken by Sears, and it cannot "be held liable for failure to accommodate unless it 'bears responsibility for the breakdown in the interactive process.'"[103]

Wiederhold argues Sears became aware that she required some type of accommodation as early as March 27, 2010, and without question at least by July 4, 2010.  She claims Sears never communicated with her in good faith regarding appropriate accommodation options, as required by the ADA and the applicable regulations.  Wiederhold acknowledges that Sears provided her with certain accommodations for a period of time without discussing available options with her, but she maintains Sears never engaged in any interactive process with her regarding accommodation options, never responded to her request for a motorized scooter, and never told her they were trying to find a cashier job for her.[104]

The Ninth Circuit has explained what an employer must do to comply with its duty to engage in an interactive process with an

---

[102]Dkt. #19, ECF p. 38.

[103]*Id.*, ECF p. 39 (quoting *Zivkovic v. S. Calif. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002)).

[104]Dkt. #23, pp. 15-28; ECF pp. 20-33.

employee.   The legislative history of the ADA indicates, "'A problem-solving approach should be used to identify the particular tasks or aspects of the work environment that limit performance[,] and to identify possible accommodations . . . employers first will consult with and involve the individual with a disability in deciding on the appropriate accommodation.'" *Barnett*, 228 F.3d at 1111 (quoting S. Rep. No. 101-116, at 34 (1989)). "This inter-active process 'requires: (1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective.'" *U.S.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir. 2010) (quoting *Zivkovic v. S. Calif. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002)). The employer does not have to provide a particular accommodation requested or preferred by the employee; "'the employer need only provide some reasonable accommodation.'" *Id.*, 620 F.3d at 1110-11 (quoting *Zivkovic*, 302 F.3d at 1089; internal quotation marks omitted).

The employer's duty to accommodate "'is a continuing duty that is not exhausted by one effort.'" *Id.* (quoting *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001)). Thus, when an employer "is aware that the initial accommodation is failing and further accommodation is needed," *id.*, the employer must continue to engage in the interactive process in order to determine an "appropriate reasonable accommodation" that will enable the employee "to perform the duties of the position." *Id.*, 620 F.3d at 1110-11 (internal quotation marks omitted; citing *Humphrey*, 239 F.3d at 1137, 1138). Notably, the issue of whether or not an

34 - MEMORANDUM OPINION AND ORDER

1  accommodation is reasonable ordinarily is a question of fact.  *Id.*
2  (citing *Lujan v. Pac. Maritime Ass'n*, 165 F.3d 738, 743 (9th Cir.
3  1999)).

4        Wiederhold's contentions regarding Sears's alleged failure to
5  engage in the interactive process as early as March, or even July,
6  of 2010, are not persuasive.  As the *Barnett* court noted, the
7  applicable regulation indicates that in determining an appropriate
8  reasonable accommodation, "'it *may* be necessary for the [employer]
9  to initiate an informal, interactive process with the [disabled
10 employee] in need of the accommodation.'"  *Barnett*, 228 F.3d at
11 1111-12 (quoting 29 C.F.R. § 1630.2(*o*)(3); emphasis added).  The
12 court noted the use of the phrase "may be necessary" indicates that
13 in some cases, interaction *will not be* necessary because "the
14 employer and the employee can easily identify an appropriate
15 reasonable accommodation." *Id.*, 228 F.3d at 1112.  Such was the
16 case here, where Sears initiated appropriate accommodations in
17 compliance with each of Wiederhold's doctor's notes from the time
18 she began having problems with her feet until at least November
19 2010, when she was put back on the regular work schedule for MCAs.

20       However, on the current record, Wiederhold has shown an issue
21 of fact exists as to whether Sears properly engaged in the
22 interactive process with her from the first of November 2010,
23 forward.  There is a question of fact whether appropriate communi-
24 cation between the parties could have prevented Wiederhold's resig-
25 nation altogether, and resulted in her placement in a cashier's
26 position that would have accommodated her needs.  Although Sears
27 argues it was continuing to consider Wiederhold's request and was
28 looking for other jobs Wiederhold might be able to do within the

35 - MEMORANDUM OPINION AND ORDER

1  company, it is for the jury to decide whether the facts presented
2  satisfy the interactive process required by the ADA.  I therefore
3  **deny** Sear's Motion for Summary Judgment on this basis.

4

5  *C.    Disparate Treatment/Constructive Discharge Claim*

6        Sears first argues Wiederhold cannot prevail on her disparate
7  treatment claim because she is not a "qualified" individual with a
8  disability, for purposes of the ADA.   The court has already
9  resolved this argument for purposes of summary judgment, above.

10       Sears further argues Wiederhold did not suffer any adverse
11 employment action because she resigned voluntarily.   Thus, Sears
12 asserts Wiederhold must be able to establish "constructive dis-
13 charge" in order to prevail on this claim.

14       To show constructive discharge under federal law, Wiederhold
15 must show Sears created or maintained working conditions that were
16 "so 'extraordinary and egregious [as] to overcome the normal moti-
17 vation of a competent, diligent, and reasonable employee to remain
18 on the job to earn a livelihood and to serve his or her employer.'"
19 *Wood v. GCC Bend, LLC*, 270 Fed. Appx. 484, 486 (9th Cir. 2008)
20 (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1183 (9th Cir. 2007)).
21 Under Oregon law, Wiederhold must show "that she experience[d] a
22 concrete change in the terms and conditions of her employment that
23 caused her to resign."  *Id.* (citing *Doe v. Denny's*, 327 Or. 354,
24 359, 963 P.2d 650, 654 (1998)).   Wiederhold must show Sears's
25 alleged failure to accommodate her disability created working
26 conditions for her that were so intolerable, any reasonable person
27 in her position would have resigned because of them.  *McGanty v.*
28 *Staudenraus*, 321 Or. 532, 901 P.2d 841 (1995).   Sears argues

36 - MEMORANDUM OPINION AND ORDER

Wiederhold has failed to meet these standards of proof, or to show that any material issue of fact exists regarding whether she was constructively discharged.

Further, even if Wiederhold has alleged facts sufficient to support a constructive discharge claim, Sears argues such a claim is barred because Wiederhold failed to exhaust her administrative remedies regarding her constructive discharge claim.[105] Wiederhold moved to strike this argument, raised for the first time in Sears's reply brief, as untimely, and also because she had not had an opportunity to respond.[106] I denied Wiederhold's motion,[107] but allowed the parties to brief the exhaustion issue separately.[108]

Wiederhold asserts Sears is basing its exhaustion argument solely on the written charge prepared by the EEOC from Wiederhold's "Charge of Discrimination" form. She characterizes the written charge as "very short and rather open-ended."[109] She also argues there is no exhaustion requirement under Oregon law, and she has complied with the state law requirement that her lawsuit be filed within one year of the allegedly discriminatory act.[110]

With regard to her constructive discharge claim under federal law, Wiederhold argues the court must look beyond the language of

---

[105]*See* Dkt. #32, ECF pp. 25-29.

[106]Dkt. #39.

[107]Dkt. #41.

[108]*See* Dkt. ##32, 45, 45-1, 50, & 51.

[109]Dkt. #45, p. 1.

[110]*Id.*, p. 2.

37 - MEMORANDUM OPINION AND ORDER

her initial charge, and focus on "what claims the EEOC actually investigated, or what claims it reasonably should have investigated."[111]   According to Wiederhold, her lawsuit could "encompass any claims that the EEOC would have had to consider to evaluate, or even understand, [her] theory of the case."[112]   She asserts her claims in this case need only be "consistent with" the facts she reported to the EEOC, and could "'"encompass any discrimination like or reasonably related to the allegations in the EEOC charge."'"[113]   In a supplemental declaration on this issue, Wiederhold states she told the EEOC investigator that she had resigned, and her resignation was based, primarily, on Sears's refusal to accommodate her disability.[114]   Indeed, she argues she has maintained throughout that her resignation was due to Sears's failure to accommodate her, so a constructive discharge claim is consistent with her failure to accommodate claim.[115]

Sears responds that merely telling the EEOC investigator she had resigned due to Sears's failure to accommodate her falls well short of notifying the EEOC, and therefore of putting Sears on notice, that Wiederhold was claiming Sears "intentionally and

---

[111]*Id.*, p. 3 (citing *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1100 (9th Cir. 2002)).

[112]*Id.* (citing *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994)).

[113]*Id.* (citing *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002), in turn quoting *Oubichon v. N. Am. Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir. 1973)).

[114]Dkt. #45-1, ¶ 4.

[115]*See* Dkt. #45, p. 4.

1 continually subjected her to a hostile and discriminatory environ-
2 ment in an effort to drive her from the workplace as a result of
3 her disability - constructive discharge."[116]    Sears agrees with the
4 standards upon which Wiederhold relies, acknowledging that her
5 lawsuit could include allegations of discrimination that either
6 "'fell within the scope of the EEOC's *actual* investigation or an
7 EEOC investigation which *can reasonably be expected* to grow out of
8 the charge of discrimination.'"[117]    However, Sears argues the EEOC
9 did not investigate a constructive discharge claim, nor could such
10 an investigation reasonably have been expected to grow out of
11 Wiederhold's failure to accommodate claim.[118]

12    In support of her assertion that the court should focus on
13 claims the EEOC "reasonably should have investigated," Wiederhold
14 cites *B.K.B. v. Maui Police Department*, 276 F.3d 1091 (9th Cir.
15 2002).    Sears argues *B.K.B.* is distinguishable on its facts.

16    In *B.K.B.*, the plaintiff, a female police officer, sued the
17 police department and the County of Maui for alleged discrimination
18 based on her race and sex in violation of Title VII and state law;
19 retaliation; violation of a Hawaii whistleblower statute; and
20 infliction of emotional distress.    The district court dismissed the
21 plaintiff's federal and state statutory sexual harassment claims at
22 the summary judgment stage, finding she had failed to exhaust her
23 administrative remedies.

24

25    [116]Dkt. #50, p. 2.

26    [117]*Id.* (quoting *Freeman*, *supra* note 112, 291 F.3d at 636
27 (citations omitted; emphasis in original).

28    [118]*Id.*, pp. 3-5.

1    The record in the case indicates the plaintiff filed a "Charge
2 of Discrimination" in November 1997, with the Hawaii Civil Rights
3 Commission ("HCRC"). A concurrent federal administrative review of
4 her discrimination claim also was initiated as a result of her
5 filing of the form. On the charge form, and in a pre-complaint
6 questionnaire, the plaintiff checked boxes "indicating discrimina-
7 tion and harassment based on race, color, and sex." *B.K.B.*, 276
8 F.3d at 1096. She gave some examples of harassment by fellow
9 officers, and retaliation and harassment she suffered after she
10 wrote a memorandum to her Captain about the alleged harassment, but
11 the examples she gave did not specifically involve sexual harass-
12 ment. "The EEOC and HCRC issued Plaintiff a right-to-sue letter
13 without investigating her claims." *Id.*, 276 F.3d at 1096. After
14 the plaintiff filed suit, she obtained a declaration from an HCRC
15 employee stating her "'Right to Sue was intended to afford her a
16 lawsuit involving harassment, on the protected basis of race,
17 color, and sex as indicated on the Pre-Complaint Questionnaire
18 . . . and the [charge].' Nevertheless, the district court dis-
19 missed Plaintiff's federal and state statutory sexual harassment
20 claims prior to trial, on the ground that she had waived them by
21 failing to raise them adequately in her charge." *Id.*

22    On review, the Ninth Circuit noted that the purposes of an
23 administrative charge are to provide the charged party with notice
24 of the claim, and to narrow the issues for prompt adjudication and
25 decision. *Id.*, 276 F.3d at 1099 (internal quotation marks,
26 citations omitted). Concerning the EEOC's treatment of the
27 administrative charge, the court held as follows:

28

> The EEOC's failure to address a claim asserted by the plaintiff in her charge has no bearing on whether the plaintiff has exhausted her administrative remedies with regard to that claim. *Yamaguchi v. United States Dep't of the Air Force*, 109 F.3d 1475, 1480 (9th Cir. 1997). Similarly, as in the present action, whether the EEOC in fact conducted *any* investigation at all is not material for purposes of exhaustion. *Cf. Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1413, 1416 n.7 (10th Cir. 1993) (where the EEOC "did not complete an investigation" plaintiff nevertheless succeeded in exhausting claims reasonably related to the allegations included in her EEOC charge). Subject matter jurisdiction extends over all allegations of discrimination that either "fell within the scope of the EEOC's *actual* investigation or an EEOC investigation which *can reasonably be expected* to grow out of the charge of discrimination." *[EEOC v.] Farmer Bros [Co.]*, 31 F.3d [891,] 899 (9th Cir. 1994)] (emphasis in the original) (internal quotations omitted); *see also Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990) ("The jurisdictional scope of a title VII claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation.").

*B.K.B.*, 276 F.3d at 1099-1100 (emphasis in original).

The *B.K.B.* court noted that Ninth Circuit precedents take a deferential approach and "construe the language of EEOC charges 'with utmost liberality since they are made by those unschooled in the technicalities of formal pleading.'" *B.K.B.*, 276 F.3d at 1100 (quoting *Kaplan v. Int'l Alliance of Theatrical & Stage Employees*, 525 F.2d 1354, 1359 (9th Cir. 1975), *abrogated on other grounds by Laughon v. Int'l Alliance of Theatrical Stage Employees*, 248 F.3d 931 (9th Cir. 2001)). The court found the crucial element of a discrimination charge to be "the factual statement contained therein," noting that a court should consider all of a plaintiff's civil claims "reasonably related to allegations in the charge to the extent that those claims are consistent with the plaintiff's

41 - MEMORANDUM OPINION AND ORDER

original theory of the case." *Id.* (citations omitted).  In *B.K.B.*,
the court found the plaintiff had included allegations of sexual
harassment in her pre-complaint questionnaire, and the "charge
itself [was] deficient in recording her theory of the case due to
the negligence of an agency representative who complete[d] the
charge form[.]" *Id.*, 276 F.3d at 1102.  The court found that the
declaration of the HCRC employee suggested any deficiency in the
charge itself was attributable to the agency, not to the plaintiff,
and because the plaintiff had "checked boxes indicating a charge of
sexual harassment, . . . [the court] should read the term
'harassment' broadly where it appears in the factual allegations of
Plaintiff's discrimination charge. . . . Though not as artfully as
we might wish, Plaintiff was complaining about racial and sexual
harassment in her charge.  We therefore hold that her Title VII
sexual harassment claim was properly exhausted." *Id.*, 276 F.3d at
1102, 1103.

Sears argues that in *B.K.B.*, the EEOC had actual knowledge of
the plaintiff's intention to bring a sexual harassment claim.  In
contrast, in the present case, Wiederhold did not put the EEOC on
notice - and, therefore, Sears was not on notice - that Wiederhold
intended to assert a claim for constructive discharge.  Sears
asserts the EEOC never had notice of or investigated a claim of
constructive discharge, and the position statement Sears filed in
response to Wiederhold's EEOC charge "clearly demonstrates it was
not on notice of such a claim[.]"[119]  Sears argues "the law is clear
that constructive discharge claims do <u>not</u> reasonably flow from

---

[119]Dkt. #50, p. 2.

42 - MEMORANDUM OPINION AND ORDER

prior discriminatory acts, but are separate acts of discrimination that require administrative exhaustion."[120]

Sears relies on *Ong v. Cleland*, 642 F.2d 316 (9th Cir. 1981), for its argument that Wiederhold's failure to allege constructive discharge in her EEOC complaint is fatal to such a claim in the present action.  In *Ong*, the plaintiff, "an American citizen of Chinese national origin," filed an administrative action claiming she was denied a promotion with the Veterans Administration due to her national origin.  While the administrative case was pending, Ong "took a disability retirement due to a nervous condition allegedly provoked by the complained-of employer conduct." *Ong*, 642 F.2d at 317.  The administrative action resulted in a ruling in Ong's favor on her claim that she was not promoted due to her race. She was awarded a retroactive promotion to the date of her disability retirement.  However, she did not receive back pay because her new position "was rated lower than her previous position and she did not hold the new position for the twelve-month period required for promotion to the next GS level." *Id.*, 642 F.2d at 318.

Ong filed suit for additional damages on the theory that "she was 'constructively discharged' by the discriminatory promotional decision of the agency[.]" *Id.*, 642 F.2d at 319.  In a deposition taken in connection with the case, she testified her nervous symptoms that resulted in her retirement arose from her anxiety surrounding the administrative action. *Id.* On summary judgment, "the district court found as a matter of law that Ong had waived her

---

[120] *Id.* (emphasis in original).

right to federal court jurisdiction over her Title VII claim for additional damages by failing to exhaust her administrative remedies." *Id.*, 642 F.2d at 317.  The Ninth Circuit's discussion of the issue on appeal is instructive in the present case:

> Although Ong attempts to frame her disability retirement as "like or reasonably related" to the employer's established discrimination in promotion, her arguments are not persuasive.  Ong did not allege administratively that her employer had engaged in a pattern or practice of discrimination against her. [Citation omitted.]  Nor did Ong attempt to amend her administrative complaint to encompass events occurring after it was originally lodged.  *Cf. Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970) (amended charges could be heard in federal court); *De Medina v. Reinhardt*, 444 F. Supp. 573, 578-79 (D.D.C. 1978) (plaintiff's failure to amend administrative complaint to add subsequent claims of discrimination was failure to exhaust and required dismissal of those claims from federal court suit).  The issue of Ong's disability retirement and particularly, whether it was proximately caused by the agency's promotional decision was not presented administratively.  The agency was therefore not given the opportunity to consider the issue before initiation of the Title VII suit.  The failure to raise an issue administratively subverts the procedures and policies of Title VII and justifies precluding its presentation in federal court. [Citation omitted.] . . .  Ong's failure to raise administratively the issue of her disability retirement as an incident of her employer's discrimination in promotion prevented agency consideration of it.  Because Title VII is intended to promote informal conciliation of employment discrimination claims and because Ong's failure to present that issue frustrated Title VII policy, we find that Ong failed to exhaust her administrative remedies.

*Ong*, 642 F.3d at 320.

In Wiederhold's "Charge of Discrimination," she stated Sears had denied her request for reasonable accommodation for her disability.  She asserted, "I believe that I was discriminated

44 - MEMORANDUM OPINION AND ORDER

against because of my disability in violation of the [ADA]."[121]  On
her EEOC Intake Questionnaire, Wiederhold claimed Cole Vyse had
intentionally scheduled her for tasks that were the hardest on
Wiederhold's feet "on purpose . . . as if she was trying to force
[Wiederhold] to quit by causing [her] mysery [sic]."[122]  Wiederhold
indicated Sears had "back[ed] [her] into a corner and [made her]
lose the income and medical [her] family needs to survive."[123]  A
subsequent letter to Wiederhold from the EEOC investigator demon-
strates that the EEOC was aware Wiederhold had resigned from her
job subsequent to initiating the EEOC action.  The EEOC investiga-
tor wrote to Wiederhold about her discrimination charge, indicating
the basis of her charge was an allegation that she was "discrimi-
nated against due to [her] disability when [she] was denied a
reasonable accommodation."[124]  The investigator described Sears's
response to the charge as follows:

> The employer states that you were provided
> with reasonable accommodations, including
> additional leave.  When medical information
> indicated that you were no longer qualified to
> perform the essential functions of you[r]
> position as a Merchandise and Customer Assis-
> tant Associate, the employer did not have any
> other full time positions available that would
> allow for the accommodations you needed. You
> were offer a part time position, but you chose
> to resign.[125]

---

[121]Dkt. #45-1, p. 3.

[122]Dkt. #22-1, Ex. 27, p. 3; ECF p. 204.

[123]*Id.*, p. 5; ECF p. 205.

[124]*Id.*, p. 5.

[125]*Id.*

45 - MEMORANDUM OPINION AND ORDER

1  I find Wiederhold's statements on the intake questionnaire, and the
2  EEOC's knowledge that she had resigned, were sufficient to put the
3  agency on notice that Wiederhold was claiming Sears's actions
4  forced her to resign.  I find the facts of this case are more
5  analogous to *B.K.B.* than to *Ong*, with the failure to expressly
6  include a constructive discharge claim in the formal charge resting
7  with the agency, not with Wiederhold.  This conclusion is
8  consistent with the Ninth Circuit's deferential approach, and
9  recognition that the initial charge and factual recitation are pre-
10 pared "by those unschooled in the technicalities of formal
11 pleading."  *B.K.B.*, 276 F.3d at 1100 (internal quotation marks,
12 citation omitted).  Thus, I find Wiederhold has exhausted her
13 administrative remedies with regard to her constructive discharge
14 claim.  I further find she has shown an issue of material fact
15 exists as to whether Sears's actions, or inaction, created
16 intolerable working conditions that caused Wiederhold to resign.
17 Accordingly, I **deny** Sear's motion for summary judgment as to
18 Wiederhold's constructive discharge claim.

19     However, Wiederhold has not offered *any* evidence to support
20 her claim that Sears regularly engages in discriminatory treatment
21 of disabled individuals.  At oral argument, Wiederhold's attorney
22 conceded that Wiederhold has not produced evidence of a pattern and
23 practice of discrimination by Sears against disabled employees
24 other than Wiederhold.  Accordingly, I **grant** Sears's Motion for
25 Summary Judgment as to Wiederhold's claim for injunctive relief,
26 contained in Count I of her First Claim for Relief.

27 / / /

28 / / /

46 - MEMORANDUM OPINION AND ORDER

1      *CONCLUSION*

2         Sear's Motion for Summary Judgment (Dkt. #17) is **granted in**

3   **part and denied in part.**  The motion is **granted** as to Wiederhold's

4   claim for injunctive relief.   The motion is **denied** on all other

5   bases.

6         Sears's motion  (Dkt. #29)  to  strike  paragraph  3  of

7   Wiederhold's Declaration is **denied.**

8         Wiederhold's motion  (Dkt. #39)  to  strike  section  D.1  of

9   Sears's reply brief is **denied as moot.**

10        Sear's motion (Dkt. #47) to strike Eric Fjelstad's supple-

11  mental declaration (Dkt. #46) in support of Wiederhold's opposition

12  to Sears's motion for summary judgment was **withdrawn** by Sears.

13        IT IS SO ORDERED.

14                        Dated this 23rd day of August, 2012.

15

16                        /s/ Dennis J. Hubel

17                        _____

18                        Dennis James Hubel
                          Unites States Magistrate Judge

19

20

21

22

23

24

25

26

27

28

47 - MEMORANDUM OPINION AND ORDER